*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

In re: THOMAS FRANCIS BARRETT, JR.,

　　　　　　　　　　　　　　　　　　*Debtor.*

_____

THOMAS FRANCIS BARRETT, JR.,

　　　　　　　　　　　　　　*Plaintiff-Appellee,*

　　　　*v.*

EDUCATIONAL CREDIT MANAGEMENT
CORPORATION,

　　　　　　　　　　　　　*Defendant-Appellant.*

No. 06-3519

>

On Appeal from the Sixth Circuit
Bankruptcy Appellate Panel.
No. 01-45444—Kay Woods, Bankruptcy Judge.

Argued: April 20, 2007

Decided and Filed: June 8, 2007

Before: RYAN and GRIFFIN, Circuit Judges; HOOD, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Daniel S. Fisher, St. Paul, Minnesota, for Appellant. Robert A. Ciotola, Canfield, Ohio, for Appellee. **ON BRIEF:** Frederick S. Coombs III, HARRINGTON, HOPPE & MITCHELL, Youngstown, Ohio, for Appellant. Robert A. Ciotola, Canfield, Ohio, for Appellee.

---

## OPINION

---

　　　GRIFFIN, Circuit Judge. Plaintiff-debtor Thomas Barrett filed a voluntary Chapter 7 bankruptcy petition on December 28, 2001, seeking the discharge of $302,342 in unsecured nonpriority debt. Among those claims are two student loans totaling $94,751. Defendant Educational Credit Management Corporation ("ECMC") appeals the judgment of the Sixth Circuit Bankruptcy Appellate Panel ("BAP") affirming the bankruptcy court's order discharging Barrett's

---

[*]The Honorable Joseph M. Hood, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

student loan debts on the basis of "undue hardship" pursuant to 11 U.S.C. § 523(a). ECMC argues that Barrett was required to provide corroborating evidence in the form of expert medical proof to establish that the circumstances underlying his inability to repay the loans will likely continue for a substantial portion of the repayment period. ECMC contends further that Barrett failed to establish that he has made a good faith effort to repay his loans in light of his decision not to participate in the Income Contingent Repayment Plan. For the reasons set forth below, we affirm.

I.

Plaintiff-debtor Thomas Barrett incurred student loan debt totaling $94,751 while earning masters degrees in both Health Administration and Business Administration from Saint Louis University in 1999. Barrett has a long history of medical problems.[1] After receiving his graduate degrees, Barrett was diagnosed with Hodgkin's disease in the summer of 2000. Oncologists at the Cleveland Clinic discovered compromised lymph nodes in Barrett's neck, abdomen, spleen, lungs, and liver, and Barrett was diagnosed as being at the "highest level" of Hodgkin's, stage IVB. He underwent intravenous chemotherapy treatment for over nine months, from August 2000 to April 2001. While Barrett received chemotherapy, his student loans became due. Barrett applied for, and received, an economic hardship deferment for his loans.[2] While Barrett was recovering from chemotherapy, he was too weak to work and was unable to earn any income. Due to accumulated medical bills, Barrett filed for Chapter 7 bankruptcy on December 28, 2001.

In October 2002, Barrett began experiencing pain in his shoulders. He was diagnosed with avascular necrosis, a condition that causes the patient's bones to die due to lack of blood supply. Barrett testified that he experiences "massive pain" in his shoulders, hips, and knees. He was originally prescribed OxyContin pain medication, and later underwent surgery in April 2004 to repair the joint in his right shoulder. Following the surgery, Barrett continued to experience "a great deal of pain" in his shoulder. After arthroscopic surgery revealed that the shoulder cap's prosthetic was loose, a second surgery on the right shoulder was performed in August 2004. Due to the second surgery, Barrett was forced to wear a sling on his right shoulder at the trial before the bankruptcy court.

Barrett testified that he now takes forty milligrams of OxyContin three times per day, ten milligrams of Oxycodon four times per day, and two milligrams of hydromorphone four times per day, and that the pain in his right shoulder is so great that he "can't even hold a coffee cup with [his] right hand." Following a nine-month recovery period for each surgery, Barrett expects to undergo surgery to repair his left shoulder and both hips.

Due to the pain that he experiences, Barrett's work opportunities are limited. Barrett testified that he currently performs "computer networking jobs" on a word-of-mouth basis that require no more physical exertion than the movement of a computer mouse with his left hand. Barrett testified

---

[1] As the bankruptcy court noted, Barrett's health problems began when he was an undergraduate student at the University of Rhode Island ("URI") in 1989:

> [Barrett] was initially diagnosed with mononucleosis. In the fall of 1991, after he noticed that he had black spots in his field of vision, he was diagnosed with Pars Plinitus, a disease of the retina, which is also an autoimmune condition. During spring semester 1992, [Barrett] began to suffer high fevers, severe night sweats and loss of weight. His symptoms became so severe that he left [URI] and returned to his parents' home in Youngstown, Ohio, to seek treatment. Although he consulted a physician and had blood tests and a CAT scan, his symptoms subsided and the doctor was not able to make a diagnosis. Despite his health problems, [Barrett] returned to [URI], finished his undergraduate work and received his degree.

[2] Barrett was approved for economic hardship deferments in the fall of 2000, 2001, 2002, and 2003.

that he has attempted to find a job with a company but has been unable to secure employment because he "cannot work at a level that would have to be sustained to work at a full-time job." Because of the pain that he experiences, Barrett's ability to work "really depends on how [he] feel[s] that day, and that can be very bad or it can be somewhat bad." Moreover, Barrett testified that, in his experience, employers were not willing to hire someone in his condition, stating "if I bring up what I've – what's happened to me in the past, it seemed like they lose interest." Barrett testified that because his medical condition has worsened since he filed the Chapter 7 petition, he has incurred an additional $20,000 in medical bills and expenses. According to Barrett's Schedule J, his projected monthly income is $868 and his projected monthly expenses total $3,575.[3]

On November 23, 2004, the bankruptcy court conducted an adversary proceeding. Barrett was the sole witness. In addition to testimony from Barrett, the bankruptcy court also admitted Barrett's tax returns for the years 2000, 2002, and 2003, Barrett's Schedules I and J listing his current expenditures, a February 14, 2003, letter from Dr. Brad Pohlman, a print-out of a search performed on the Department of Education's Interactive Repayment Calculator, and a copy of the 2004 HHC Poverty Guidelines as originally published in the Federal Register on February 13, 2004. On December 14, 2004, the bankruptcy court issued a memorandum opinion stating that it found Barrett's testimony to be credible and concluding that Barrett had demonstrated that it would be an undue hardship if his student loans were excepted from his Chapter 7 discharge. On appeal, the BAP unanimously affirmed the bankruptcy court's determination. ECMC now timely appeals.

## II.

We focus our review of cases appealed from the BAP on the bankruptcy court's decision, reviewing findings of fact for clear error, and conclusions of law de novo. *In re Tirch*, 409 F.3d 677, 680 (6th Cir. 2005). Whether the repayment of student loans would impose an undue hardship on the debtor is a question of law reviewed de novo. *Id.*; *In re Cheesman*, 25 F.3d 356, 359 (6th Cir. 1994).

## III.

The Bankruptcy Code limits the discharge of student loans only to those circumstances where repayment "will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). As "undue hardship" is not defined in the Bankruptcy Code, we have joined most of our sister circuits in adopting the three-part *Brunner* test, named for the case in which it

---

[3]At trial, Barrett testified that he earned approximately $2,000 per month, and that his average expenses per month totaled approximately $4,000. According to his 2003 income tax return, Barrett received $2,563 in wages and salary, $2,421 in business income, and $8,034 in unemployment compensation.

originated.[4] *Oyler v. Educ. Credit Mgmt. Corp.*, 397 F.3d 382, 385 (6th Cir. 2005). The *Brunner* test requires the debtor to prove, by the preponderance of the evidence:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* (quoting *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)). To satisfy the second prong, Barrett must show that circumstances indicate a "certainty of hopelessness, not merely a present inability to fulfill financial commitment." *Id.* at 386 (quoting *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993)); *see also In re Hornsby*, 144 F.3d 433, 438 (6th Cir. 1998) (observing that debtors "need not live in abject poverty before a discharge is forthcoming"). These circumstances may include, but are not limited to, "illness, disability, a lack of useable job skills, or the existence of a large number of dependents." *Id.* Ultimately, the most important factor in satisfying the second prong is that the "additional circumstances" must be "beyond the debtor's control, not borne of free choice." *Id.*

On appeal, ECMC does not challenge the bankruptcy court's finding that Barrett satisfied the first prong of the *Brunner* test: that Barrett cannot maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans. Rather, ECMC argues that Barrett was required, and failed, to provide expert corroborating evidence to carry his burden of proof in satisfying the second prong. In particular, ECMC contends that Barrett could not competently testify to his prognosis or future health, and that expert medical evidence was necessary to competently project Barrett's future ability to repay his student loans.

In our prior interpretations of "undue hardship" under 11 U.S.C. § 523(a)(8), we have not declared that expert medical evidence is necessary to corroborate a claim of "additional circumstances" premised on the debtor's health. In *Tirch*, the most recent Sixth Circuit case to apply the *Brunner* test to § 523(a)(8), we held that a debtor's student loans are nondischargeable where the debtor fails to demonstrate how her physical condition prevented her from working. *Tirch*, 409

---

[4] In 1973, a Report of the Commission on the Bankruptcy Laws of the United States was circulated with a draft of a statutory rewrite that later became the new Bankruptcy Code. Report of the Comm'n on the Bankr. Laws of the U.S., H.R. Rep. No. 93-137 (1973), *reprinted in* LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY, app. 4(c) at 4-219 (15th rev. ed. 2004); *see also* Terrence L. Michael & Janie M. Phelps, *"Judges?! We Don't Need No Stinking Judges!!!": The Discharge of Student Loans in Bankruptcy Cases and the Income Contingent Repayment Plan*, 38 TEX. TECH L. REV. 73, 77-78 (2005). The Report proposed "making all educational debt nondischargeable within the first five years of the repayment period unless repayment would impose an undue hardship on the debtor or the debtor's dependents." Michael & Phelps, *supra*, at 77. The Report elaborated on the meaning of "undue hardship" as follows:

> In order to determine whether nondischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the educational debt.

*Id.*

F.3d at 682.[5] Despite ECMC's argument to the contrary, we did not hold that the debtor's claim was foreclosed by the lack of corroborating expert medical evidence. Rather, we emphasized repeatedly that the debtor's testimony by itself failed to meet the "undue hardship" standard. *See id.* at 681. In fact, we explicitly declined to consider whether expert corroboration was necessary to satisfy the second *Brunner* prong: "We have no occasion to delve into the BAP's holding that the bankruptcy court's assessment of the debtor's testimony regarding her mental and emotional health is sufficiently reliable to support the bankruptcy court's findings in that regard, without the necessity of expert corroboration, because the bankruptcy court made no such assessment." *Id.* at 681. Under *Tirch*, to satisfy *Brunner*'s second prong, Barrett must "precisely identify [his] problems and explain how [his] condition would impair [his] ability to work in the future." *Id.* at 681. *Tirch*, however, does not require Barrett to offer corroborating expert testimony to meet this burden.

Three other decisions by this court interpreting 11 U.S.C. § 523(a)(8), cited by the parties, provide little guidance. In *Oyler*, this court formally adopted the *Brunner* test as the governing standard in an undue hardship analysis and held that a debtor's decision to accept a low-paying job – despite the fact that he was qualified for higher-paying work – did not constitute an undue hardship. *Oyler*, 397 F.3d at 386. In *In re Miller*, 377 F.3d 616, 622 (6th Cir. 2004), we held that a debtor seeking a partial, rather than total, discharge of student loans must nevertheless satisfy § 523(a)(8)'s undue hardship standard. Neither *Oyler* nor *Miller* discuss the evidence a debtor must offer to support a finding that the debtor faces additional circumstances that indicate the debtor's state of affairs are likely to persist.

In *In re Cheesman*, 25 F.3d 356, 359 (6th Cir. 1994), we upheld a finding by the bankruptcy court that the debtors had satisfied the undue hardship standard. Because the *Cheesman* debtors did not claim "additional circumstances" due to their health, *Cheesman* is not on point. Nevertheless, we based our conclusion that the debtors had satisfied the "additional circumstances" requirement in part based on the debtors' employment history, which did "not indicate that the Cheesmans' financial condition would improve considerably if she obtained a position as a teacher's aide." *Id.* at 360. Thus, *Cheesman* suggests that a debtor's work history is a relevant and significant consideration in projecting whether a debtor's current state of affairs is likely to persist.

We decline to adopt here ECMC's position that Barrett was required to produce an expert witness to corroborate his health status, and instead concur with the BAP that "a requirement of corroborating evidence 'when Plaintiff is unable to afford expert testimony or documentation imposes an unnecessary and undue burden on Plaintiff in establishing his burden of proof,' if corroborating evidence is understood to be limited to expert medical testimony." Even where some corroborating evidence of the debtor's claimed illness is required, the notion that only expert medical testimony would suffice has been rejected. *See, e.g., Burton v. Educ. Credit Mgmt. Corp. (In re Burton)*, 339 B.R. 856, 879 (Bankr. E.D. Va. 2006) ("This Court, in light of . . . the fact that other credible evidence often exists, does not suggest expert testimony is the only method of corroboration available to debtors."); *Swinney v. Academic Fin. Servs. (In re Swinney)*, 266 B.R. 800, 805 (Bankr. N.D. Ohio 2001) ("Although such [corroborating] evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position . . . . For example, if properly authenticated, letters from a treating physician could be utilized.").

---

[5]The debtor in *Tirch* complained of several medical and emotional problems, including attention deficit disorder, chronic anxiety, depression, a prior colorectal surgery from which she had a slow recovery, and the loss of her sense of taste. *Tirch*, 409 F.3d at 679. The debtor testified that the principal problem that was causing her to miss work was her loss of taste. *Id.* at 681.

We also find unpersuasive Barrett's position that, because of the expense involved with obtaining corroborating medical evidence, requiring such evidence creates a significant and unnecessary bar to debtors seeking discharge of student debt.[6] At the adversary proceeding, Barrett argued that he was unable to submit his medical records or to obtain expert medical testimony because the cost to procure such evidence was prohibitive. ECMC disputes Barrett's contention, pointing to OHIO REV. CODE § 3701.741, which limits a patient's copying costs for his medical records. OHIO REV. CODE § 3701.741(B)(1) (limiting copying costs to two dollars and fifty cents per page for the first ten pages, fifty-one cents per page for pages eleven through fifty, and twenty cents per page for pages fifty-one and higher); *see also* 45 C.F.R. § 164.524(c)(4) (requiring health care providers to impose "reasonable" copying costs in response to patient's request for medical records). We agree with ECMC that the copying costs of medical records are reasonable costs that a debtor may bear in order to substantiate his claim of undue hardship. In any event, we note that other forms of corroborating evidence may suffice – and, in this case, do suffice – to corroborate a debtor's claim of undue hardship based on illness. Medical bills, letters from treating physicians, and other indicia of medical treatment aside from medical records or expert medical testimony may corroborate a debtor's claim of undue hardship based on the debtor's health.

We hold that the evidence in the record is sufficient to support the bankruptcy court's finding that additional circumstances exist indicating that Barrett's current financial state is likely to persist for a significant portion of the repayment period. First, Barrett's petition was supported by his testimony, which detailed his medical history and current state of health. Because Barrett received a master's degree in health administration and attended medical school courses, Barrett testified informatively and cogently about his medical history. Barrett then testified about being diagnosed with avascular necrosis, describing with great detail the two surgeries performed on his right shoulder due to the avascular necrosis. Barrett explained how his condition affects his health and prevents him from working, stating that he is constantly in great pain and that movement in his right arm is limited to moving a computer mouse. The bankruptcy court found Barrett to be credible:

> Defendant does not challenge Plaintiff's testimony about his medical history and, indeed, Defendant's own exhibit, in the form of the letter from Dr. Pohlman, verifies that Plaintiff has been diagnosed and treated for stage IV Hodgkin lymphoma and received the ABVD chemotherapy treatment. There is also no doubt that Plaintiff actually underwent the two surgeries on his right shoulder earlier this year nor is there any challenge to the fact that Plaintiff is currently being prescribed heavy doses of pain medication. Based upon Plaintiff's physical demeanor, this Court finds it credible that Plaintiff is in a great deal of pain at all times. Even if Plaintiff is not required to have the five or more surgeries that he currently anticipates, which he stated would have a likely recovery period of nine months each, the pain that Plaintiff currently experiences is not likely to subside. As a consequence, this Court finds it credible that Plaintiff's current health problems will likely continue for a significant period into the future and that such problems not only prohibit him from working full time at this time, but will likely prohibit him from obtaining full-time employment into the foreseeable future.

The bankruptcy court, as the trier of fact, was competent to assess and credit Barrett's testimony, and such credibility determinations are traditionally afforded great weight. *See Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1460 (9th Cir. 1997) ("The bankruptcy judge was, of course,

---

[6]ECMC argues that, by not requiring Barrett to provide expert medical testimony, the bankruptcy court improperly created a "poverty" exception to the Federal Rules of Evidence. ECMC's argument lacks merit. In finding that Barrett did not need to provide expert testimony, the bankruptcy court was not ruling on the admissibility of evidence. Rather, its holding concerned the amount and type of evidence sufficient to support a finding of undue hardship.

entitled to assess the credibility of the witnesses and to accept [debtor's] testimony while rejecting [creditor's]."); *Faden v. Insurance Co. of N. Am. (In re Faden)*, 96 F.3d 792, 797 (5th Cir. 1996) ("When a bankruptcy judge, after listening to all of the testimony, finds that a debtor shirked his responsibility to provide notice to his creditors, this Court cannot then usurp the role of the bankruptcy judge and mandate its own equitable relief."). *See also Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001) ("We are generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor.").

Nevertheless, ECMC argues that the bankruptcy court erred in allowing Barrett to testify about his avascular necrosis. We review the bankruptcy court's decision to admit Barrett's testimony for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997); *Sicherman v. Diamoncut, Inc. (In re Sol Bergman Estate Jewelers, Inc.)*, 208 F.3d 215, 2000 U.S. App. LEXIS 3357, at *4-5 (6th Cir. Feb. 29, 2000) (unpublished table decision). The bankruptcy court properly precluded Barrett from testifying about his prognosis and the cause of his current ailments. The court did, however, allow Barrett to testify concerning his diagnosis of avascular necrosis and how his health affects his life and limits his ability to work. We find no error in admitting this testimony. Indeed, a bankruptcy petitioner would have much difficulty in fulfilling our mandate as expressed in *Tirch* that the debtor "precisely identify [his] problems and explain how [his] condition would impair [his] ability to work in the future" if such testimony was prohibited. *Tirch*, 409 F.3d at 681.

In addition to Barrett's testimony, the bankruptcy court also considered evidence at the hearing that corroborated his testimony concerning his medical history. Barrett offered a letter from his treating physician, Dr. Pohlman, who confirmed that Barrett was diagnosed with stage IVB Hodgkin lymphoma in July 2000, and that Barrett received eight cycles of chemotherapy treatment in response. Dr. Pohlman also stated that Barrett "had vasculitis, which preceded the diagnosis of lymphoma and has required a gradually tapering dose of steroids since the completion of his therapy." Although Dr. Pohlman's letter was written before Barrett was diagnosed with avascular necrosis, and therefore does not discuss Barrett's prognosis with regard to that disease, it confirms Barrett's diagnosis of Hodgkin's and his rigorous chemotherapy treatment as a consequence.

In addition to Dr. Pohlman's letter and Barrett's testimony that described in significant detail his medical history and his diagnosis of avascular necrosis, the bankruptcy court also considered Barrett's tax returns for the years 2000, 2002, and 2003, which corroborate his testimony concerning his past ability to earn income due to his health problems since receiving his master's degree in 2000. Barrett's testimony concerning his past inability to work due to his health problems was further corroborated by Barrett's receipt of economic hardship deferments on his student loans in the years 2000, 2001, 2002, and 2003. Barrett's employment and salary history is a relevant and important consideration to determine whether it is likely that Barrett will be unable to maintain a minimal standard of living if forced to repay his student loans. *Cheesman*, 25 F.3d at 360. Moreover, Barrett also testified, and the bankruptcy court found credible, that his future ability to earn income was limited because – although he had actively sought work – employers would lose interest in his candidacy once they found out about his medical history.

We conclude that this evidence is sufficient to support the bankruptcy court's finding that Barrett is unlikely to be able to maintain a minimal standard of living if forced to repay his student debt. Unlike the debtor in *Tirch*, Barrett testified to how his past physical condition affects his ability to earn money. *Tirch*, 409 F.3d at 682. Moreover, unlike the debtor in *Oyler*, Barrett's financial woes are not the result of his own choice of profession, but rather are due to circumstances beyond his control. *Oyler*, 397 F.3d at 386 (noting that the "additional circumstances" under the *Brunner* test must be "beyond the debtor's control, not borne of free choice"). Barrett's long medical history and inability to work consistently indicate a "certainty of hopelessness" that satisfies

the standards of 11 U.S.C. § 523(a)(8), and it is apparent that this outlook is borne out of circumstances beyond his control.

Finally, we note that Barrett's account of his medical history and his current health status is uncontroverted. ECMC has offered neither evidence to contradict Barrett's description of his history of medical problems nor any proof to rebut Barrett's testimony concerning his diagnosis of avascular necrosis and its impact on his ability to work and repay his student debt. Rather, ECMC has declined the opportunity to subpoena Barrett's medical records, which it could have done if it genuinely disputed Barrett's testimony concerning his current health. *See* 5 U.S.C. § 552a(b)(11) (permitting medical records to be disclosed "pursuant to the order of a court of competent jurisdiction"); 45 C.F.R. § 164.512(e)(1) (providing that a "covered entity may disclose protected health information in the course of any judicial or administrative proceeding," including in response to a subpoena). Moreover, ECMC has not offered any challenge to Barrett's testimony concerning his current ability to work and likelihood to gain future employment. Where, as here, the debtor testifies credibly and without rebuttal about his medical history, his current health, his employment history, and his ability to perform work functions – and that testimony is corroborated in part by a letter from the debtor's treating physician and tax records – the debtor has offered proof sufficient to support a finding of undue hardship.

IV.

ECMC also argues that Barrett failed to satisfy the third prong of the *Brunner* test – that is, Barrett failed to show that he has made a good faith effort to repay his student loans – because he did not enroll in the Income Contingent Repayment Program ("ICRP"). ECMC contends that "Barrett's refusal to apply for the ICRP payment option was without factual and legal justification" and that this refusal demonstrates a lack of good faith under *Brunner*. We find ECMC's position unpersuasive.

As described by the bankruptcy court in *In re Korhonen*, 296 B.R. 492, 496 (Bankr. D. Minn. 2003), the ICRP:

> permits a student loan debtor to pay twenty percent of the difference between his adjusted gross income and the poverty level for his family size, or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less. Under the program, the borrower's monthly repayment amount is adjusted each year to reflect any changes in these factors. The borrower's repayments may also be adjusted during the year based on special circumstances. *See* 34 C.F.R. § 685.209(c)(3). At the end of the twenty five year payment period, any remaining loan balance would be cancelled by the Secretary of Education. However, the amount discharged would be considered taxable income.

*See also Tirch*, 409 F.3d at 682 (quoting *Korhonen*). Although ECMC doesn't state so explicitly, its position would create a per se rule requiring enrollment in the ICRP to satisfy the third *Brunner* prong and thus would, in effect, eliminate the discharge of student loans for undue hardship from the Bankruptcy Code.

We have already rejected ECMC's per se position. *See Tirch*, 409 F.3d at 682 (noting that a debtor's decision not to enroll in ICRP is "not a *per se* indication of a lack of good faith"). Moreover, Congress recently enacted "the most sweeping reform of bankruptcy law since the enactment of the Bankruptcy Code in 1978." Michael & Phelps, *supra*, at 77-78; *see also* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat.

23 (codified in various sections of 11 U.S.C.).[7] Yet Congress left § 523(a)(8)'s "undue hardship" language intact. Had Congress intended participation in the ICRP – implemented in 1994 – to effectively repeal discharge under § 523(a)(8), it could have done so. In addition, requiring enrollment in the ICRP runs counter to the Bankruptcy Code's aim in providing debtors a "fresh start." The debtor is encumbered with the debt for an additional twenty-five years, regardless of the length of the student loans. If, at the end of the twenty-five years, the debtor has been unable to repay all the student loans, the remaining debt is canceled and that discharge of indebtedness is treated as taxable income. *See* Michael & Phelps, *supra*, at 105. The result, as the bankruptcy court noted, would be that Barrett would "be trading one nondischargeable debt for another."

Although Barrett's decision to forgo the ICRP is not a per se indication of a lack of good faith, his decision "is probative of [his] intent to repay [his] loans." *Tirch*, 409 F.3d at 682. Nevertheless, we conclude that Barrett has demonstrated sufficient good faith to satisfy the third *Brunner* prong. Barrett testified that he looked into the ICRP, but declined to enroll in the program because the tax consequences would be too burdensome:

> Q:    Are you familiar with the Income Contingent Repayment format?
>
> A:    Yes, I am.
>
> Q:    Did you have occasion to visit a web site to see how it worked for you?
>
> A:    Yes, I did.
>
> Q:    And what web site did you visit?
>
> A:    It's WWW-dot-finaid-dot-org.
>
>                                        . . .
>
> Q:    What did you put in for your debt?
>
> A:    My debt was a hundred thousand dollars.
>
> Q:    And what did you put for your adjusted income?
>
> A:    Approximately $15,000.
>
> Q:    And what about income – the interest rate, what interest rate did you put in?
>
> A:    Four percent.
>
> Q:    What was the conclusion of that document as to the total balance you would still owe at the end of a 25-year period?
>
> A:    I would owe . . . two [hundred] sixty-eight thousand seven hundred and sixty-one dollars (sic) would be my final payment to the Government in the form of tax.
>
> Q:    I'm sorry. That would be the total amount that the Government would write off?

---

[7]For an illuminating description of the history of the ICRP and its application to student loan discharge bankruptcy cases, see Michael & Phelps, *supra*, at 81-84.

A:      That's correct.

. . .

Q:      And what – did you conclude what kind of tax impact that would have on
        you?

A:      That would be huge.  It would be like paying back more than the actual loan
        amount, so it doesn't really make any sense.  This is not a viable alternative.

The bankruptcy court credited Barrett's testimony, concluding that Barrett "has used his best efforts to maximize financial potential; recognizing that his health has not permitted him to work full time, he still works part time to the best of his ability."  In light of the significant tax consequences of enrolling in the ICRP due to his present and future inability to pay his student debt, Barrett's decision to forgo the ICRP was reasonable and is not grounds for finding bad faith.[8]

Although Barrett has made no payments on his student loans, no loan payments have come due; Barrett has received economic hardship deferments for each year since graduation due to his health.  Even had payments become due, his inability to repay the loans was unlikely to evidence bad faith, as his monthly expenses exceed by double his monthly income.  Despite his health problems that have prevented him from working full-time since graduation, Barrett has made repeated efforts to work as his health and opportunities have allowed, even as his physical capability has been limited to moving a computer mouse.  Further, Barrett testified that but for the medical bills, he would not have filed his Chapter 7 petition.

In sum, we concur with the BAP's analysis of the third prong of the *Brunner* test:

The Debtor in this case has reasonable expenses, yet continues to accrue debt for medical care.  He has made efforts to increase his income within his ability.  He has cooperated in providing information to his student loan creditors on an annual basis to obtain deferments.  He has never had the ability to repay his student loans as evidenced by the deferments granted to him as the result of economic hardship. . . . Utilization of the ICRP would likely result in a substantial increase in his student loan debts over the repayment period. The Debtor has amply demonstrated his good faith.

V.

The BAP's judgment affirming the bankruptcy court's December 14, 2004, order discharging Barrett's student loan obligation to defendant ECMC is therefore affirmed.

---

[8]ECMC argues that Barrett's tax concerns are overblown because Barrett would only be forced to pay those taxes if he became solvent.  We disagree.  If ECMC's position is accepted, then Barrett is faced with the following choice:  resign himself to insolvency for the rest of his life or be forced to repay a student debt that is twice its current size.  Moreover, ECMC's argument overlooks the psychological effect of having a significant debt remain, *see Balaski v. Educ. Credit Mgmt. Corp. (In re Balaski)*, 280 B.R. 395, 400 (Bankr. N.D. Ohio 2002) ("While defendant may believe holding debtor hostage for twenty-five years to debt and compounding interest is not an undue hardship, the court does not accept this view."); BAP op. at 10 ("ECMC . . . fails to take account of the additional worry and anxiety that the Debtor is likely to suffer if he is compelled to watch his debt steadily increase knowing that he does not have the ability to repay it for reasons beyond his control"), and discards the central aim of the Bankruptcy Code – to provide the debtor a fresh start.