NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0538n.06

No. 13-4068

**FILED**
Jul 22, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| In re: CARL V. MACE; CINDY A. MACE, | ) | |
| Debtors. | ) | |
| ------------------------------------------------------------------ | ) | |
| TIMOTHY S. KELLY; SHARON L. KELLY, | ) | **ON APPEAL FROM THE BANKRUPTCY APPELLATE PANEL FOR THE SIXTH CIRCUIT** |
| | ) | |
| Appellants, | ) | |
| v. | ) | |
| | ) | |
| CARL V. MACE; CINDY A. MACE, | ) | **OPINION** |
| | ) | |
| Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE:    GILMAN, GIBBONS, and STRANCH, Circuit Judges.

**STRANCH, Circuit Judge.**    Timothy and Sharon Kelly, residents of Pennsylvania, appeal from the decision of the Bankruptcy Appellate Panel (BAP) that reversed a favorable decision the Kellys obtained in the Ohio Chapter 13 bankruptcy case of the debtors, Carl and Cindy Mace. The Kellys filed timely proof of an unsecured claim, to which the Maces objected. After an evidentiary hearing, the bankruptcy court found that Timothy Kelly was a more credible witness than Carl Mace. The court found that Carl Mace made and breached an enforceable oral agreement with Timothy Kelly to relieve the Kellys of their personal guaranty on a 2002 bank loan. As a result, the bankruptcy court allowed in full the Kellys' claim for $313,781.36. Because the bankruptcy court's findings are not clearly erroneous and the court did not err in

allowing the Kellys' claim, we REVERSE the decision of the BAP, AFFIRM the decision of the

bankruptcy court, and REMAND for further proceedings consistent with this opinion.

## I. FACTS

In 1995, Timothy Kelly and Carl Mace formed K&M Feeds, Inc., a corporation doing

business as Olde Country Store, a feed and hardware retail establishment in New Wilmington,

Pennsylvania. Each man owned fifty percent of K&M's stock. Mace served as the corporation's

President and Kelly held the position of Secretary-Treasurer. Kelly operated the feed store and

received an annual salary.

In 1998, K&M borrowed money from the First National Bank of Slippery Rock (FNB).

The Maces personally guaranteed the loan and pledged their Ohio residence and farm as

collateral. The Kellys personally guaranteed the loan, but they did not have any collateral to

pledge as security for the loan. A third party, Dan Travolini, also personally guaranteed the loan.

By 2002, Kelly and Mace discussed selling K&M because Mace wanted out of the

business. A "One-Year Agreement" was drafted, apparently designed to anticipate different buy-

out scenarios that might occur. For instance, the agreement provided that all of the K&M stock

would be transferred to Mace, presumably to facilitate a sale of the business, and in return K&M

would execute a promissory note to the Kellys in the amount of $40,000, to be paid upon the sale

of the business. The Kellys reserved the right to approve any sale. The agreement also provided

that the Kellys could purchase Mace's stock for $40,000, but if the Kellys took over the business,

the $40,000 would be paid when the Maces' collateral pledged for the 1998 loan was released.

The parties vigorously dispute when the "One-Year Agreement" was signed. Kelly and

Mace agreed that they did not execute it on January 1, 2002, the date shown on the agreement.

The bankruptcy court found that Kelly's testimony on this point was more credible than Mace's.

Although Mace said the agreement was signed a few days after January 1, 2002, Kelly testified that the agreement was signed in November or December 2002. Kelly's testimony was corroborated by an October 23, 2002 letter written by K&M's attorney, Robert Clark, to the Kellys and the Maces. In that letter, Clark wrote that he was enclosing "a new draft of the Agreement and Promissory Judgment Note," and suggested that "[i]f they are satisfactory, we need to move forward by making arrangements to have them signed and have the stock transferred to Carl and Cindy." Kelly Ex. A. The bankruptcy court found that Clark would not have written this letter if Kelly had already transferred his stock to Mace on January 1, 2002, as Mace claimed. According to Kelly, the agreement was backdated to benefit Mace in his separate dealings with Sky Bank.

During the same time period, Thomas Skelton became involved in K&M. Skelton operated a livestock auction business next door to K&M's feed store. Kelly and Skelton both testified that Mace, Kelly, and Skelton reached an agreement to restructure K&M so that all of them would be co-owners of K&M. Mace denied that any such arrangement was discussed.

In May 2002, Kelly and Skelton refinanced K&M's 1998 loan with FNB. This new loan was in the amount of $347,000, to be paid in monthly installments, with a balloon payment due on May 25, 2007. Kelly signed the bank note as K&M's President and Skelton as its Secretary-Treasurer. Although neither of them actually held the corporate positions listed on the bank note, Mace agreed to allow the representations. As a result of the 2002 loan transaction: (1) FNB relinquished the Maces' personal guaranty as well as FNB's interest in the Maces' real property that had been pledged as collateral for the 1998 loan; (2) FNB relinquished the personal guaranty of Travolini on the 1998 loan; (3) Skelton pledged his farm as collateral for the new loan; and (4) the Kellys and the Skeltons personally guaranteed the new loan.

Mace claimed that this transaction occurred because he wanted out of the business and his stipulations were clear: in exchange for his half of K&M's stock, he demanded (1) freedom from any obligation on the 1998 loan; (2) freedom from outstanding liabilities to K&M vendors; and (3) payment of $40,000 in cash. The bankruptcy court found that Mace alone benefited from the 2002 loan transaction because FNB relinquished the Maces' pledged collateral and personal guaranty on the 1998 loan, yet Mace still retained ownership of fifty percent of K&M's stock. The court found that no stock was ever transferred to Skelton and no change in ownership of K&M occurred even though the only parties legally obligated on K&M's 2002 loan were the Kellys and the Skeltons.

By 2004, Mace wished to be the sole owner of K&M. He submitted a loan application to FNB to refinance the 2002 loan. Mace proposed to FNB that he would substitute his farm for the Skeltons' farm as collateral for a new loan and the bank would relinquish the personal guarantees of the Kellys and the Skeltons. FNB denied Mace's application on April 30, 2004. Having received a copy of the denial letter, Kelly knew that Mace could not refinance the 2002 loan through FNB.

Despite this development, Kelly and Mace met in attorney Clark's office in New Wilmington, Pennsylvania in May 2004 to sign documents transferring sole control of K&M to Mace. The bankruptcy court found that, during this meeting, K&M, acting through Mace, gave Kelly a promissory note for $40,000 bearing a maturity date of May 1, 2008. This note was backdated to January 1, 2002. The court also determined that Kelly signed the back of his stock certificate and handed it to Mace, and that signature, too, was backdated to January 1, 2002. Kelly testified these documents were backdated at Mace's request because he had represented to a bank in or before 2002 that he was the sole owner of K&M Feeds.

The bankruptcy court further found that a third document, entitled "Agreement," was presented for Mace's signature during the May 2004 meeting at attorney Clark's office, but Mace refused to sign it.[1] The "Agreement" provided in paragraph 1 that K&M would execute a promissory note to Kelly in the amount of $40,000 with no interest, to be paid in three installments on December 1, 2004, September 30, 2005, and May 1, 2008. The Agreement further provided in paragraph 2 that "Mace and K&M agree to a complete general release of Kelly from any and all outstanding notes, mortgages, liens or any liability whatsoever as it relates to the operation or transfer of K&M to Mace." Kelly Ex. C. Likewise, Kelly granted a complete general release to Mace and K&M. The parties further agreed in paragraph 3 to cooperate to bring corporate records up to date. Finally, in paragraphs 4 and 5, the Agreement provided: "It is a requirement of this agreement that [FNB] release Kelly"; upon Kelly's release from the FNB loan, "day to day operations and management of K&M shall transfer to Mace"; and Kelly's employment would continue to May 15, 2004 at the same pay rate unless Kelly terminated his employment earlier. *Id.*

According to Kelly, the primary reason Mace gave for his refusal to sign the agreement was that FNB had just denied his application to refinance the 2002 loan, and Mace did not believe he could comply with paragraph 2 of the "Agreement" as written to substitute his own name as guarantor on a loan in place of the Kellys. Nonetheless, Mace told Kelly:

> Tim, we've been friends and business partners a long time. You know and I know what my obligations are to release you from this loan. I will release you. We do not need this piece of paper. We've done business since the beginning on a handshake. You know I'll live up to my obligations.

R. 163 Page ID 121–22. Mace did not predicate his promise to Kelly on any refinancing contingency, and Kelly accepted the oral promise. Mace testified that he did not make an oral

---

[1] An earlier version of this agreement existed, but it also was not signed. Kelly Ex. B.

promise to assume responsibility for the Kellys' obligation on the 2002 loan; he agreed only *to try* to do so, but he could not control or guarantee the decisions made by any financial institutions.

Having heard this discrepancy in the testimony, the bankruptcy court again characterized Kelly as a more credible witness than Mace. The court found that Mace made an unequivocal oral agreement with Kelly to free the Kellys from their personal guaranty of the 2002 loan. The court further found that Mace made the agreement even though he knew he could not require a bank to take any particular action. The oral agreement was supported by adequate consideration, the court found, because Kelly transferred all of his K&M stock to Mace. The court placed the same value on Kelly's half of the stock that Mace placed on his: freedom from bank loan obligations, freedom from outstanding liabilities to vendors, and $40,000 cash. This oral agreement forms the basis for the Kellys' claim later filed in the Maces' Chapter 13 bankruptcy case.

At the same May 2004 meeting in Clark's office, Kelly and Mace agreed that Kelly would stay on as manager of the feed store and receive a salary. Within a few days, however, Kelly notified Mace that he would not remain in his position, and Mace installed his son as manager of the feed store. *Id.* Mace did not obtain refinancing for the 2002 loan.

On November 17, 2006, FNB notified Mace by letter that the 2002 loan would mature in six months. Mace Ex. 10. The Kellys and the Skeltons received copies of this letter. Kelly continued to place his trust in Mace's oral promise and believed that the loan would be refinanced at another financial institution by the loan maturity date, alleviating the obligations of the Kellys and the Skeltons on the bank note. Although Kelly no longer communicated with Mace, Kelly discussed the situation with Skelton. Kelly believed Skelton had the most to lose in

a loan default because Skelton's farm was pledged as collateral. Kelly thought that he had no leverage to negotiate with FNB because he did not pledge any collateral for the loan. He relied on Skelton and Mace to resolve the matter, and he did not communicate with FNB. Skelton corroborated Kelly's testimony. In April 2008, FNB sent a letter to the Kellys and the Skeltons informing them that the loan had not been paid at maturity in May 2007 and the bank intended to institute legal proceedings to collect on the debt.

The Kellys filed suit in state court to recover on the $40,000 promissory note Mace signed on behalf of K&M in May 2004. The Kellys obtained a judgment against K&M, but did not collect on it.

During the state-court litigation, Mace's deposition was taken in September 2008. At that time Mace testified that the 2002 loan was "in the process of being refinanced" with other lenders, that he and Skelton were working together on the refinance, and that he had assured Skelton he would be relieved of his obligations on the 2002 loan. Kelly Ex. F. When asked if that meant that the guarantors on the 2002 FNB loan "will be released from liability," Mace answered, "Absolutely," and confirmed that he had an agreement "with FNB to get things done by the 30th of September." *Id.* When asked if it was "definite that the guarantors" on the FNB loan "will be released by the end of September," Mace replied, "Yes." *Id.*

During the evidentiary hearing in bankruptcy court, Mace equivocated about his deposition testimony, claiming he had no power to require banks to do anything and his only obligation was "to try" to get the Kellys removed as personal guarantors on the 2002 loan. The bankruptcy court rejected Mace's testimony, finding that he had made an unequivocal promise to the Kellys that they would not be responsible for K&M's debt obligation.

FNB ultimately sued the Kellys on their personal guaranty in Pennsylvania state court to recover the 2002 loan balance. In August 2011 FNB obtained a judgment against the Kellys for $338,988.12 plus interest, attorney's fees, and costs. FNB also foreclosed its mortgage on the Skeltons' farm.

Mace closed the feed store and filed for bankruptcy protection. The Kellys filed a timely proof of claim asserting a general unsecured claim against the Maces in the amount of $313,781.36. The bankruptcy court overruled the Maces' objection to the Kellys' proof of claim and allowed the claim as filed. The Maces appealed.

The BAP reversed on the ground that no enforceable oral agreement was formed between Mace and Kelly to relieve the Kellys of their personal guaranty on the 2002 loan. The BAP found that Mace promised only to try to do so, and because Mace could not control the decisions of third-party banks, any agreement formed between Mace and Kelly was unenforceable. The BAP also determined that the Kellys failed to present sufficient facts to establish a claim against the Maces for $313,781.36. Although the Kellys had sought recovery on the $40,000 promissory note in state court, the BAP found that the Kellys did not assert, prior to the filing of the Maces' bankruptcy case, that they had an enforceable claim against the Maces in the amount requested.

## II. ANALYSIS

When reviewing a case appealed from the BAP, we independently review the bankruptcy court decision, giving no deference to the BAP's opinion. *In re Shafer*, 689 F.3d 601, 605 (6th Cir. 2012); *In re Dickson*, 655 F.3d 585, 589–90 (6th Cir. 2011). We may set aside the bankruptcy court's factual findings only if they are clearly erroneous, but we review legal issues de novo. *In re Shafer*, 689 F.3d at 605. A finding of fact is clearly erroneous only if it is against the clear weight of the evidence or if, upon review, we reach a definite and firm conviction that a

mistake has been made. *In re Am Trust Fin. Corp.*, 694 F.3d 741, 749 (6th Cir. 2012). If there are two permissible views of the evidence, the bankruptcy court's choice between them cannot be clearly erroneous. *In re Mitan*, 573 F.3d 237, 241 (6th Cir. 2009).

A proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). A filed proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a); *In re Dow Corning Corp.*, 456 F.3d 668, 680 (6th Cir. 2006). The filing of an objection to a proof of claim creates a contested matter that must be resolved after notice and a hearing. Fed. R. Bankr. P. 9014; *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000).

The burden of going forward with the evidence shifts during the claim filing and objection process. Initially, the claimant must allege sufficient facts to support a legal liability to the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 172–74 (3d Cir. 1992). If that is done, the burden of going forward shifts to the objector to produce evidence which, if believed, refutes at least one of the allegations that is essential to the legal sufficiency of the claim. *Id.* Once that is accomplished, the burden again shifts to the claimant to prove the validity of the claim by the preponderance of the evidence. *Id.* The claimant always bears the burden of persuasion. *Id.*

The bankruptcy court identified the only disputed issue as whether there was sufficient evidence to support the existence of an oral agreement between Mace and Kelly. Finding that the Kellys alleged sufficient facts to support a prima facie valid claim, the court turned to the objectors—the Maces—and found that they failed to meet their burden of production.

Under Pennsylvania law, a contract is formed when the parties reach a mutual understanding, exchange consideration, and delineate the terms of their bargain with sufficient clarity. *Pennsy Supply, Inc. v. Am. Ash Recycling Corp.*, 895 A.2d 595, 600 (Pa. Super. Ct.

2006). Consideration consists of a detriment to the promisee or a benefit to the promisor. *Id.* Where an oral contract is concerned, the court must consider the surrounding circumstances and course of dealing between the parties to ascertain their intent. *Mountain Props., Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001). As the party relying on the existence of the oral contract, Kelly had the burden to prove by "clear and precise" evidence that the agreement was formed. *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 584–85 (E.D. Pa. 2012) (noting that the Pennsylvania Supreme Court has not decided what standard of proof applies to show the existence of an oral contract, but the majority of federal district court opinions apply the "clear and precise" standard over the "preponderance of the evidence" standard).

Sitting as the trier of fact, the bankruptcy court assessed the credibility of the testimony given by Mace, Kelly, and Skelton. *See In re Barrett*, 487 F.3d 353, 362 (6th Cir. 2007). Having had the opportunity to observe these witnesses on the stand, assess their demeanor and review the evidence, the bankruptcy court decided that Kelly and Skelton were more credible witnesses than Mace. *See id.* That credibility determination led the court to rely on the account of events given by Kelly and Skelton over the version provided by Mace.

Taking into account all of the circumstances, the bankruptcy court ruled that Mace—acting for K&M during a May 2004 meeting at the office of K&M's attorney, Robert Clark—gave Kelly a promissory note for $40,000 cash to be paid in 2008 and, in addition, Mace orally promised to relieve Kelly of all K&M debt in consideration for Kelly signing over to Mace his half of K&M's stock. The parties reached mutual agreement on these terms, exchanged consideration, and delineated the terms of their bargain with sufficient clarity. *Id.* The court also found that Mace reaffirmed his oral promise when he testified at a 2008 deposition.

The parties' oral agreement was not required to be in writing to satisfy the statute of frauds. The statute of frauds does not apply if the promisor's main object is to serve his own pecuniary or business purpose. *See Biller v. Ziegler*, 593 A.2d 436, 440 (Pa. Super. Ct. 1991). *Accord Eastern Wood Prods. Co. v. Metz*, 89 A.2d 327, 330 (Pa. 1952). "The leading object rule applies whenever a promisor, in order to advance some pecuniary or business purpose of his own, purports to enter into an oral agreement even though that agreement may be in the form of a provision to pay the debt of another." *Biller*, 593 A.2d at 440. The bankruptcy court found that Mace, as the promisor, entered into an oral agreement with Kelly to pay Kelly's obligation on the 2002 debt in order to obtain Kelly's half of K&M's stock and advance Mace's own pecuniary or business purposes to become sole owner of K&M. The statute of frauds provides no bar to the enforceability of the oral agreement.

The bankruptcy court also rejected any notion that Mace's oral promise to Kelly was not enforceable because it was dependent upon FNB's relinquishment of the Kellys' personal guaranty. When the promise was made, Mace and Kelly already knew that FNB would not refinance the 2002 loan, but Mace filed applications with other lenders to refinance the loan. The bankruptcy court found that Mace made the unconditional promise in return for Kelly's stock and complete control of K&M. When Mace ultimately could not refinance the loan, the bankruptcy court found, Mace was not relieved of his promise to Kelly.

The BAP rejected the bankruptcy court's reasoning, holding that Mace's oral promise was unenforceable because it required the consent of a third party; namely, FNB. Where the BAP erred was in its assumption that Mace could fulfill his promise only through the cooperation of FNB. Mace, however, could have secured the release of the Kellys' debt either by obtaining financing from another lender or by indemnifying the Kellys in the event that a

debt-collection action was filed against them. In short, Mace's promise to Kelly was not an unenforceable conditional promise as the BAP believed it to be.

Because the evidentiary record amply supports the bankruptcy court's factual findings, we are not at liberty to substitute our view of the evidence for that of the bankruptcy court, *see Mitan*, 573 F.3d at 241, and we are not left with a definite and firm conviction that a mistake has been committed, *see In re Am Trust Fin. Corp.*, 694 F.3d at 749. In light of its factual findings, the bankruptcy court did not err in holding that Mace breached the oral agreement, resulting in damages to the Kellys in the full amount of their claim, $313,781.36. The evidence demonstrated that FNB sued the Kellys on their guaranty and obtained a judgment against them exceeding the amount the Kellys claimed in the Mace bankruptcy proceeding. The Kellys are entitled to allowance of their claim in full.

### III. CONCLUSION

We uphold the bankruptcy court's factual findings because they are grounded in the evidentiary record and we uphold the court's legal conclusions because they are consonant with applicable state contract law. Accordingly, we REVERSE the decision of the BAP, AFFIRM the decision of the bankruptcy court, and REMAND the case to the bankruptcy court for further proceedings consistent with this opinion.

**GIBBONS, Circuit Judge, concurring in the judgment.**

The dispositive issue in this case is whether Mace made an enforceable promise to the Kellys. The bankruptcy court did not discuss the issue, but found that Mace promised "to obtain the Kellys' release from their obligations under the 2002 loan." The BAP held that the promise was unenforceable as a matter of law because it promised the performance of a third party—*i.e.*, a bank would be required to release the Kellys from their obligation. To avoid this problem, the majority commits two errors. First, it engages in its own factfinding, concluding that Mace's promise must have encompassed a promise of indemnity. But this court is not free to substitute its view of the evidence for that of the bankruptcy court, *In re Mitan*, 573 F.3d 237, 241 (6th Cir. 2009), and there should be no dispute that this is not what the bankruptcy court found. Second, the majority conflates the concepts of indemnity and release. Indemnity is a mechanism to obtain reimbursement on an outstanding liability; release extinguishes that liability in the first instance. I concur in the judgment, however, because the Kellys have satisfied the elements of promissory estoppel and the contract is enforceable on that basis. *See, e.g.*, *Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc.*, 636 A.2d 156, 160 (Pa. 1994).