In re Yvonne MITCHAM, Debtor.

Yvonne Mitcham, Plaintiff,

v.

U.S. Dep't of Ed., Defendant.

No. 01–3240.

United States Bankruptcy Court,
N.D. Ohio.

Jan. 15, 2003.

Elliot H. Feit, Toledo, OH, for Plaintiff.

Robert G. Young, Toledo, OH, for Defendant.

### MEMORANDUM OPINION
### AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff/Debtor's Complaint to Determine the Dischargeability of certain student loan obligations owed to the Defendant/Creditor, the United States Department of Education. At the Trial, the Parties were afforded the opportunity to present evidence and make any arguments that they wished the Court to consider in reaching its decision. The Court has now had the opportunity to review all of the arguments of counsel, the evidence presented at Trial, as well as the entire record of this case. Based upon that review, and for the following reasons, the Court finds that the Debtor is entitled to receive a discharge of her student loan obligations pursuant to the "undue hardship" standard set forth in 11 U.S.C. § 523(a)(8).

### FACTS

The Plaintiff/Debtor, Yvonne Mitcham, (hereinafter the "Debtor") is a divorced woman, 49 years of age. The Debtor has three children, all of whom are over the age of majority. In terms of health, the Debtor, although she has experienced some difficulties in the past, does not at the present time suffer from any debilitating illness(es).

At the time of Trial held in this case, the Debtor had custody of two of her grandchildren: Elijah age five; and Nathaniel age 18 months. These children have sepa-

rate fathers, but both are the sons of the Debtor's same daughter. As it concerns the custody of these children, it was revealed to the Court that the Debtor has permanent custody of Elijah, but only temporary custody of Nathaniel.

The circumstances surrounding Elijah show that the Debtor gained permanent custody of him in 1999 because the child suffered from physical abuse. As permanent custodian of the child, the Debtor receives Two Hundred Twenty-three dollars ($223.00) per month in the form of governmental assistance (ADC). The father of Elijah has been ordered to pay child support; however, none has yet been received. Furthermore, given the father's history, it is very unlikely that the Debtor will ever receive any support from him.

As for Nathaniel, the Debtor was awarded temporary custody of him in the year 2001 due to certain mental difficulties encountered by the child's mother (i.e., the Debtor's daughter). This arrangement involves keeping the child for a certain period of time during the week. At the present time, the father of Nathaniel, who is estranged from the mother, is attempting to gain custody of the child; the father, however, who is a member of the armed forces, has yet to contribute support for Nathaniel due to what can only be termed "puzzling administrative delays."

In addition to Elijah and Nathaniel, the Debtor's oldest son, William Mitcham, also lives at home. The reason for this arrangement is that this adult child, who is now 31 years of age, is disabled, having among other ailments uncontrollable diabetes and a hearing impairment. On account of his disabilities, the Debtor's son receives Five Hundred Five dollars ($505.00) per month from Social Security Disability. None of this money, however, is used to reimburse the Debtor for the food and shelter she provides to William.

Presently, the Debtor is employed with the Lucas County Children Services Department as a Case Worker. At this position, the Debtor's monthly salary, after accounting for allowable deductions, is Two Thousand One Hundred Fifty-one and 16/100 dollars ($2,151.16). (Debtor's Exhibit # 2). In the future, this income will likely increase at small, but regular intervals due to cost-of-living adjustments. In addition to her wages, the Debtor also derives income from two additional sources. First, as set forth above, the Debtor, as custodial parent of Elijah, receives Two Hundred Twenty-three dollars ($223.00) per month in the form of governmental assistance for having custody of her grandchild, Elijah. Second, the Debtor, over the past three years, has received tax refunds in the respective amounts of, (1) $4,629.00 for the tax year 2001, (2) $3,267.00 for the tax year 2000, and (3) $1,693.00 for the tax year 1999. (Creditor's Exhibits, D, E & F). Additionally, the Debtor also testified that she has recently sought other employment so as to increase her income, but has so far been unsuccessful in finding a job which would offer her an appreciable increase in her standard of living.

In terms of expenses, the Debtor put forth the following itemized list:

| | |
|---|---|
| First Mortgage | $ 277.18 |
| Second Mortgage | $ 312.09 |
| Utilities | $ 250.85 |
| Telephone | $ 40.95 |
| Home Maintenance | $ 56.24 |
| Food | $ 200.00 |
| Clothing | $ 15.00 |
| Laundry/Dry Cleaning | $ 0.00 |
| Medical Dental | $ 55.00 |
| Transportation | $ 100.00 |
| Homeowner's Insurance | $ 50.08 |
| Life Insurance | $ 94.90 |
| Auto Insurance | $ 81.60 |
| Auto Payment | $ 432.44 |
| Daycare | $ 442.00 |
| Personal Hygiene | $ 25.00 |
| Total | $2,433.33 |

As it pertains to the above expenses, the Debtor, in addressing the disparity between her income and expenses, explained that "[s]he makes up this difference by falling behind on utilities and catching up in the months when she has no auto repair, or when she can spend less on food and at tax refund time." (Debtor's PreTrial Memoranda, at pg. 4). In addition, as it concerns the above expenses, it was brought to the Court's attention that the Debtor, prior to filing for bankruptcy, had leased an automobile for Two Hundred Ninety-five and 38/100 dollars ($295.38) per month, an amount which is significantly lower than her current auto payment of Four Hundred Thirty-two and 44/100 dollars ($432.44). The Debtor, however, explained that she had rejected her prior auto lease because the car, in addition to needing extensive repairs, was high on mileage which would have necessitated that she pay a significant amount of money when the lease expired. Along this same line, the Debtor related that her current auto payment is rather high because in order to finance a reliable vehicle, which is essential for her job, she was forced to obtain financing at a high rate on account of her bankruptcy filing.

As of the date of the Trial held in this matter, the total amount of student loan debt at issue stood at Ninety-nine Thousand Three Hundred Fifty and 16/100 dollars ($99,350.16); of this amount, Seventy-nine Thousand Four Hundred Sixty-five and 10/100 dollars ($79,465.10) constitutes principle while the remainder constitutes accrued interest. The student loan debts incurred by the Debtor were used exclusively to finance her education at Lourdes College and the University of Toledo where the Debtor, respectively, earned a Bachelor's degree in psychology in 1994 and a Master's Degree in Education in 1998. As it relates to her education, the facts presented in this case revealed a couple of additional matters. First, the Debtor, back in the 1970's, earned a degree in nursing, and up until the time she went back to school at Lourdes College, the Debtor worked at various positions in the nursing profession. According to the Debtor, however, she quit nursing and went back to school on account of health reasons. Second, in 1999 the Debtor attempted to pursue a doctoral degree, but dropped out after receiving custody of her grandchild, Elijah. It was, however, pointed out that in pursuing her doctoral degree, the Debtor did not incur any additional student loan debt.

Since incurring her student loan debts, the Debtor has made intermittent payments starting in 1992 and continuing up until the present day. In addition, the Debtor has received, at various times, a forbearance on the repayment of her student loan obligations which were eventually consolidated. The approximate amount repaid by the Debtor is Five Thousand Three Hundred dollars ($5,300.00), with the vast majority of these funds being paid prior to the time in which the Debtor received custody of her grandchild, Elijah. (Debtor's Exhibit # 3). As it relates to the Debtor's present options to repay her student loan debt, the evidence produced in this case shows that essentially two different alternatives exist. First, documentation put into evidence shows that the Debtor can make a minimum monthly payment of Three Hundred Ninety-seven and 13/100 dollars ($397.13); this amount, however, appears to only cover accruing interest. (Debtor's Exhibit # 4). Second, the Debtor, after inquiring into the Income Contingent repayment program, was offered a choice of making monthly payments of Five Hundred Fifteen and 86/100 dollars ($515.86) over a period of thirty years or monthly payments of One Thousand Thirty-one and 72/100 dollars

($1,031.72) over a period of ten years. (Debtor's Exhibit # 5).

On June 22, 2001, the Debtor filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In her petition, the Debtor listed her student loan obligations to the Debtor which accounted for approximately 80% of her total unsecured debt. In addition, the Debtor in her bankruptcy schedules, listed a home worth Twenty-five Thousand dollars ($25,000.00). This home, according to the evidence presented, is presently encumbered by two mortgages: a first mortgage in the amount of Twenty-three Thousand dollars ($23,000.00); and a second mortgage for Twenty-seven Thousand dollars ($27,000.00). Although only reaffirming on the first mortgage, the Debtor testified that she will continue to pay on both mortgages to avoid foreclosure.

## LAW

### 11 U.S.C. § 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will

impose an undue hardship on the debtor and the debtor's dependents[.]

## DISCUSSION

Under 28 U.S.C. § 157(b)(2)(I), a determination as to the dischargeability of a particular debt is a core proceeding. Thus, this matter is a core proceeding.

For reasons of public policy, Congress chose to exclude from the scope of a bankruptcy discharge those debts incurred by a debtor to finance a higher education. In enacting this exception to discharge, however, Congress recognized that some student-loan debtors were still deserving of the fresh-start policy provided for by the Bankruptcy Code. As a result, Congress, in enacting § 523(a)(8), provided that a debtor could be discharged from their educational loans if it were established that excepting the obligations from discharge would impose an "undue hardship" upon the debtor and the debtor's dependents. *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 196 (Bankr.N.D.Ohio 2000).

The term "undue hardship," however, as it is used in 11 U.S.C. § 523(a)(8) is not actually defined. As a result, various tests have been developed by the courts to determine whether "undue hardship" actually exists under any given set of factual circumstances. In this regard, this Court, in accord with those prior decisions rendered by the Sixth Circuit Court of Appeals,[1] has employed what has become to be known as the Brunner Test to determine whether a debtor is entitled to an

---

1. These cases are, *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356 (6th Cir.1994), and *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir.1998). With respect to these cases, however, it should be noted that the Sixth Circuit did not actually limit itself to the Brunner Test, but instead merely held that the Brunner Test provided a nonexclusive list of factors which should be considered in determining whether a student loan obligation could be discharged on the basis of "undue hardship."

"undue hardship" discharge of his or her student loan obligations.

 Under the Brunner Test, which is named after the case of *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2nd Cir.1987), a debtor must establish that the following three elements are in existence in order to have a student loan discharged on the basis of "undue hardship" under § 523(a)(8):

(1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and

(3) the debtor has made good faith efforts to repay the loans.

831 F.2d 395 (2nd Cir.1987). With respect to this Test, it is the debtor's burden to establish, by a preponderance of the evidence, that each of its elements have been met. *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 197 (Bankr.N.D.Ohio 2000). For purposes of this case, the Court will begin its analysis with the first prong of the Brunner Test—that is, whether the Debtor would be able to maintain a minimal standard of living if forced to repay her student loan obligation.

 The essence of the minimal standard of living requirement of the Brunner Test is that a debtor, after providing for his or her basic needs, may not allocate any of his or her financial resources to the detriment of their student loan creditor(s). *See Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir.1996). Thus, any analysis concerning the first prong of the Brunner Test must necessarily center around two considerations: (1) the debt-

or's income; and (2) those expenses which are necessary for the debtor to meet his or her basic needs. *Flores v. U.S. Dep't of Educ. (In re Flores)*, 282 B.R. 847, 854 (Bankr.N.D.Ohio 2002).

In this case, the Debtor's enumerated monthly income, including that income received for the support of Elijah, is Two Thousand Three Hundred Seventy-four and 16/100 dollars ($2,374.16). By comparison, the Debtor's enumerated monthly expenses are Two Thousand Four Hundred Thirty-three and 33/100 dollars ($2,433.33), thereby leaving the Debtor a monthly shortfall in her budget of Fifty-nine and 17/100 dollars ($59.17). To make up this shortfall, the Debtor testified that, addition to foregoing some necessary expenses, she relies upon her income tax refund which, over the past three years, has averaged a little above Three Thousand dollars ($3,000.00) or Two Hundred Fifty dollars ($250.00) per month. However, even if one were to factor in this extra income, the Debtor, based upon her enumerated expense figures, clearly does not have a sufficient amount of income to service her student loan obligation—i.e., the Debtor has less than Two Hundred dollars ($200.00) dollars per month in disposable income which is clearly less than the Three Hundred Ninety-seven and 13/100 dollars ($397.13) needed to cover the monthly interest accruing on her student loan obligation.

 The Court, however, is not required to accept, at face value, the Debtor's enumerated income and expenses. To the contrary, this Court, in looking at a Debtor's income and expenses, has held as follows:

this Court is under a duty to scrutinize, and in appropriate circumstances adjust, a debtor's income and expenses so as to ensure that such income and expenses reflect a true picture of the debtor's

financial situation. In this regard, a debtor is expected to use their best efforts to maximize their income within their vocational profile. Thus, for example, a debtor is not permitted to become voluntarily underemployed. Of equal importance, a court, although it must be sensitive to the particular circumstances of each case, should ensure that a debtor's expenses are actually necessary. For this purpose, however, certain parameters exist. On the one side, a court should not expect a debtor to live in abject poverty. On the other hand, the minimal standard of living requirement of the Brunner Test may require that a debtor make some major sacrifices, both personal and financial, with respect to their current style of living.

*Flores v. U.S. Dep't of Educ. (In re Flores)*, 282 B.R. 847, 854 (Bankr.N.D.Ohio 2002) (internal citations omitted). In applying the above principles to this case, it is clear that the Debtor, who has actively sought other employment, has used her best efforts to maximize her income within her vocational profile. In this regard, the Court is cognizant of the fact that the Debtor, as an employee of Lucas County, receives benefits that may not otherwise be available at a job which offers a slightly higher income.

As it concerns the Debtor's expenses, the Creditor argues that some of the Debtor's expenses are too high, and thus should be revised downward. In particular, the Creditor pointed to the Debtor's car and house payment. However, after considering the matter, the Court, while it agrees that these expenses do appear to be little high, does not believe that these expenses cross the barrier of reasonableness.

To begin with, given that the Debtor absolutely needs a car to earn a living, and also considering her credit history, a Four Hundred Thirty-two and 44/100 dollars ($432.44) per month car payment does not seem out of the ordinary. In addition, the Court does not feel that the Debtor's two mortgage payments of Two Hundred Seventy-seven and 18/100 dollars ($277.18) and Three Hundred Twelve and 09/100 dollars ($312.09) are unnecessarily high. In fact, a comparable figure would presumably be required for the Debtor to rent an apartment which could accommodate two children. This is not to say, however, that the Court feels that it is a good investment decision for the Debtor to continue to pay around Six Hundred dollars ($600.00) per month on a first and second mortgage payment against real estate that is worth only Twenty-five Thousand dollars ($25,-000.00). On the other hand, the Court, in considering that her mortgage payments are not extremely high, will not second guess the Debtor's decision.

However, even assuming, *arguendo*, that a minor downward adjustment is required in the Debtor's enumerated expenses, it is also clear that some of the Debtor's expenses are stated too low, thereby offsetting any gain made by such a downward adjustment. (This is even after excluding from the computation the Debtor's son, William, who being emancipated, is generally not to be considered in any ability to pay analysis under § 523(a)(8)).[2] For example, it does not seem possible that the Debtor, having custody of two small children, can realistically only allocate Fifteen dollars ($15.00) per month for clothing and

---

**2.** In *Flores v. U.S. Dep't of Educ. (In re Flores)*, 282 B.R. 847, 854 (Bankr.N.D.Ohio 2002), this Court, in looking to the use of the word dependent in § 523(a)(8), held that generally those expenses of an emancipated child should not be included within any "undue hardship" analysis, notwithstanding the presence of a moral obligation to support the child.

no money for laundry expenses. Similarly, Two Hundred dollars ($200.00) per month for food, which presumably includes diapers and other young child and baby accessories, does not appear to be sufficient to support the needs of the Debtor's family.

■ Thus, for all of the above reasons, the Court finds that the Debtor's expenses are reasonable. Therefore, in light of the fact that the Debtor's income, after accounting for her reasonable monthly expenses, is insufficient to service her student loan debt of just under One Hundred Thousand dollars ($100,000.00), the Court must find that the Debtor has sustained her burden under the "ability to pay" portion of the Brunner Test. Accordingly, the Court will now turn its attention to the second prong of the Brunner Test.

■ The second prong of the Brunner test requires that there exist additional circumstances which indicate that the debtor's distressed state of financial affairs is likely to persist for a significant portion of the student loan repayment period. The clear purpose of this requirement is to ensure that the hardship the debtor is experiencing is actually "undue," as opposed to the garden variety financial hardship experienced by all debtors who file for bankruptcy relief. *Miller v. U.S. Dep't of Educ. (In re Miller)*, 254 B.R. 200, 204 (Bankr.N.D.Ohio 2000). Implicit in this requirement is that notion that the debtor's distressed state of financial affairs be the result of events which are clearly out of the debtor's control; that is, the debtor must establish that they have done everything within their power to improve their financial situation. *Berry v. Educ. Credit Mgmt. Corp. (In re Berry)*, 266 B.R. 359, 365 (Bankr.N.D.Ohio 2000).

Pertaining to the Debtor's distressed state of financial affairs, a few initial observations can be made. First, the Debt-

or, having permanent custody of Elijah, will be financially responsible for him until he reaches the age of majority. Second, the Debtor's sole source of outside financial help for raising this child will likely be the government which presently pays only Two Hundred Twenty-three dollars ($223.00) per month. Third, in the foreseeable future, the Debtor's income, when factoring in inflation, will not likely increase at a rate which will significantly raise the amount of disposable income the Debtor has available. Along this same line, and although the Debtor may eventually find a better deal for a car payment, it is unlikely that the Debtor's expenses will decrease in a significant amount in the foreseeable future. Finally, the Debtor's financial position is not likely to appreciably improve if permanent custody of Nathaniel is transferred to another party considering that the Debtor does not, at the present time, have Nathaniel on a permanent basis. Thus, based upon these observations, the Debtor has clearly made out a prima facie case that her distressed state of financial affairs will continue for a significant portion of the payment period.

■ In opposition, however, to the Debtor's compliance with the second prong of the Brunner Test, the Creditor argued, in its closing arguments, that had the Debtor not taken on the responsibility of caring for her two grandchildren, she would have been able to pay for her student loan obligations. In effect, the Creditor seeks a ruling that a person, such as the Debtor, who obtains custody of a child after a student loan is incurred may not use the expenses of that child in an "undue hardship" analysis under § 523(a)(8).

Concerning the Creditor's argument, there is no dispute that the Debtor's grandchildren have greatly effected her ability to repay her student loan debt. In

fact, the record presented in this case shows that most of the Debtor's payments on her student loan obligation were made prior to the time she became the legal custodian of her grandchildren. The difficulty, however, with the Creditor's argument is that unlike a lifestyle choice,—such as a debtor allocating too much money for cable television or other forms of entertainment—the Creditor has asked this Court to make a judgment call concerning the Debtor's family arrangement, thereby putting this Court on a very slippery slope.

For example, if the Court were to accept the Creditor's argument, the question then arises whether the holding should be limited to only the facts presented in this case—i.e., only grandmothers who take legal custody of their grandchildren after incurring a student loan. Or instead, does the Court eventually expand its ruling so as to exclude from an "undue hardship" analysis, all the expenses of family members who were not in existence at the time the student loan debt was incurred. For example, could a debtor (regardless of age) adopt a child after a student loan debt is incurred and still factor in that child's expenses for purposes of an "undue hardship" analysis. Going even further, how would the expenses of an ill spouse be treated if the debtor, after obtaining his or her student loan obligation, knew that the spouse may become ill after their marriage?

 Additional concerns are also raised by the Creditor's position. First, the language of § 523(a)(8) provides that an "undue hardship" determination is made by reference to both "the debtor and the debtor's dependents[.]" Thus, contrary to the Creditor's position, no mention is made in the statute that the debtor's dependent(s) be in existence at the time the student loan debt was incurred.[3] Second, it is a fundamental principle of law that, in the absence of an overriding public concern, courts are to stay out of matters involving familial relations such as who a person may marry and how many children a person should have. *See generally Seal v. Morgan,* 229 F.3d 567, 575 (6th Cir. 2000) (fundamental rights include the right to marry, to have children, to direct the education and upbringing of one's children, and marital privacy).

Thus, for all of the above reasons, the Court finds it improper to make a judgment call concerning those decisions the Debtor made with respect to her family arrangement. As such, the Court finds that the Debtor has sustained her burden under the second prong of the Brunner Test. Accordingly, the last issue to address is whether, pursuant to the third prong of the Brunner Test, the Debtor has made a good faith effort to repay her student loan debts.

 As is self-evident, one of the primary factors in determining whether a debtor made a good faith effort to repay their student loan debt looks to whether the debtor actually made payments on the debt, and if so, the amount of debt that was repaid. *Flores v. U.S. Dep't of Educ. (In re Flores),* 282 B.R. 847, 856 (Bankr. N.D.Ohio 2002). In this case, no dispute exists that the Debtor made numerous payments on her student loan obligation. In addition, while the total amount of these payments was relatively small compared to

---

**3.** There is no question that the Debtor's grandchildren, Elijah and Nathaniel, fall within the meaning of a dependent for purposes of § 523(a)(8). *See Leslie Womack Real Estate, Inc. v. Dunbar (In re Dunbar),* 99 B.R. 320, 324 (Bankr.M.D.La.1989) (defining a dependent as "a person who reasonably relies on the debtor for support and whom the debtor has reason to and does support financially.").

the total debt, the Debtor's payments, which totaled well over Five Thousand dollars ($5,000.00), were clearly more than de minimis.

 The extent of payments made on a student loan debt, however, are not the only factors to consider in a good faith analysis. In this regard, this Court has set forth the following, nonexclusive, list of factors that should be considered in determining whether a debtor made a good faith effort to repay their student loan debt:

(1) whether a debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;

(2) whether the debtor has realistically used all their available financial resources to pay the debt;

(3) whether the debtor is using their best efforts to maximize their financial potential;

(4) the length of time after the student loan first becomes due that the debtor seeks to discharge the debt;

(5) the percentage of the student loan debt in relation to the debtor's total indebtedness;

(6) whether the debtor obtained any tangible benefit(s) from their student loan obligation.

*Id.* As applied to this case, it is clear that the last two factors cut against a finding of good faith as the large majority of the Debtor's outstanding unsecured debt is comprised of her student loan obligations, and the Debtor, by obtaining a job in her chosen field of study, obtained a very real and tangible benefit from her educational debt. On the other hand, the first three considerations, as has been previously discussed, go in favor of a finding of good faith. Similarly, the fourth consideration set forth above also cuts in favor of a finding of good faith as the Debtor waited a considerable period of time before seeking a discharge of her student loan debt. Thus, in looking at the above considerations, in conjuncture with the Debtor's more than de minimis remunerations to the Creditor, the Court finds that the greater weight of the evidence in this case falls in favor of finding that the Debtor, in accordance with the third prong of the Brunner Test, acted in good faith in her attempts to repay her student loan debt.

Therefore, in summation, the Court finds that the Debtor has sustained her burden under all three prongs of the Brunner Test. As such, the Debtor is entitled to receive a discharge of all her student loan obligations pursuant to the "undue hardship" standard set forth in 11 U.S.C. § 523(a)(8). In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the student loan debts of the Plaintiff/Debtor, Yvonne Mitcham, to the Defendant/Creditor, the United States Department of Education, be, and are hereby, determined to be DISCHARGEABLE DEBTS.