In re Alethea A. LAMENTO, Debtor.

Alethea A. Lamento, Plaintiff,

v.

U.S. Dept. of Education, et al., Defendants.

Bankruptcy No. 13–18398.
Adversary No. 14–1054.

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

Filed Oct. 29, 2014.

Lee R. Kravitz, Cleveland, OH, for Debtor/Plaintiff.

Erin E. Brizius, Office of the United States Attorney, Renee A. Bacchus, Cleveland, OH, for Defendants.

## MEMORANDUM OF OPINION

PAT E. MORGENSTERN–CLARREN, Chief Judge.

The plaintiff-chapter 7 debtor Alethea Lamento brought this adversary proceeding seeking a determination that her student loan debt of about $72,000.00 is dischargeable under 11 U.S.C. § 523(a)(8) because repaying the loans would be an undue hardship. The two defendants, the United States of America, on behalf of the U.S. Department of Education, and Educational Credit Management Corporation, contest the complaint. For the reasons stated, the debtor proved that the loans are dischargeable.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1334 and General Order No. 2012–7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. The debtor's complaint to determine the dischargeability of her student loan debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and is within the court's constitutional authority as analyzed by the United States Supreme Court in *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

## THE TRIAL

The plaintiff presented her case through her own testimony, stipulated facts, and agreed exhibits. The defendants presented their cases through cross-examination, together with the stipulated facts and agreed exhibits.

The findings of fact are based on that evidence and reflect the court's weighing of the evidence presented, including determining the credibility of the witness. "In doing so, the Court considered the witness's demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language or nuance of expression." *In re The V Companies,* 274 B.R. 721, 726 (Bankr.N.D.Ohio 2002). *See* FED. R. BANKR.P. 7052 (incorporating FED.R.CIV.P. 52). The court found the debtor's testimony to be credible.

## FACTS

### The Debtor's Education and Marriage History

The debtor Alethea Lamento married Carmen Lamento in 2000 when she was 21 years old. She had attended Notre Dame College for the three years before that, intending to major in psychology. Car-

men[1] did not want Alethea to continue to go to college, instead saying that she should stay home and take care of her family. Alethea left college at that point and in November 2001 gave birth to their daughter. In addition to forbidding Alethea from continuing with college, Carmen would not let her get a job.

Alethea described Carmen as "very controlling" and as mentally, emotionally, and psychologically abusive. She made police reports about some of his behavior, but did not take them further. Alethea gave birth to their son in August 2003. Again, Carmen would not let her return to college and said that she should stay home and take care of their children.

In about 2004, Alethea enrolled in the Academy of Court Reporting to learn court reporter skills. Her marriage continued to be difficult and she could not do the required daily practice. As a result, she dropped out within the year. She also started to work part-time at Giant Eagle, but then had to quit at Carmen's insistence.

In 2006, Alethea enrolled in night classes at Stautzenberger College to become a paralegal. She encountered the same resistance from Carmen and gave the effort up after one year.[2]

Alethea and Carmen separated in 2007 and Alethea filed for divorce in July of that year. Alethea and the children moved in with her mother and the mother's husband. Carmen did not at that time help with the children.

The two reconciled later in 2007 based on Carmen's promise that he would change and everything would be different. In the meantime, Alethea had been getting medi-

cal help and had gone on anti-depressants. Because Alethea wanted to try to keep her family together for the children's sake, she dismissed the divorce petition in December 2007.[3] Carmen then broke all of his promises. In 2008, Alethea filed for divorce for the second time.[4] She also began working at Giant Eagle, which is where she still works today. The court entered a divorce decree in May 2009.

Alethea and Carmen reconciled again and remarried, again because Alethea thought it would be best for the children. Three months later—in March 2010—she filed for divorce and the court entered the decree soon thereafter.[5]

Each time that Alethea and Carmen separated, Alethea and the children moved in with Alethea's mother and her mother's husband. Her mother and stepfather did not charge her rent or for utilities because they were trying to help her get back on her feet. Alethea and the children have been living with these relatives continuously for the last four years with the same agreement. Alethea testified without contradiction that if she did not live rent-free with her mother and stepfather, she and the children would either be on the street or in Section 8 (government subsidized) housing.

Carmen does not have an obligation to pay child support for reasons that are not in the record. He does on occasion pick the children up from school, and he takes them every other weekend and every other holiday. When the children are with him, he feeds them and might buy them some clothes, but the testimony on the latter point was vague. A state court order directed him to pay one-half of the expenses

---

1. The court will refer to the debtor and her ex-husband by their first names because they have the same last name.

2. Defs. Joint Exh. C, Interrogatory no. 1.

3. Pl. Exh. 10–1.

4. Pl. Exh. 11–1.

5. Pl. Exh. 12–1.

for the children's braces, glasses, and activity fees. He paid his share of the activity fees, but refused to pay his share of the braces or glasses.

Alethea does not have health insurance; she is not eligible for Giant Eagle's insurance and she was refused under the Affordable Care Act.[6] She does not have a medical disability. Carmen pays for the children's health insurance. Neither child has a medical disability.

### Alethea's Employment at Giant Eagle

Alethea has continued to work part-time at Giant Eagle (32 hours a week) where she is now paid $10.15 an hour, slightly over the minimum wage. She has received raises over the years at the rate of about 25 cents every four to five months. She tries to get extra hours, but they are only available on the days surrounding Thanksgiving, Christmas, and Easter.

In 2011 or 2012, Alethea took a second job as a waitress at a restaurant. When she worked those three nights, her mother watched the children. Alethea earned $2.13 an hour plus tips. She quit this job after about a year because it was too much for her mother—who worked full time during the day—to take care of the children at night.

### Alethea's Efforts to Find Better Employment

Alethea has been trying for the last three years to find a better job. She has applied twice at Giant Eagle for full-time positions, once as a health and beauty department manager and the second time as a front end team leader. She did not get either position. On occasion, she works as a coordinator and that pays an extra 50 cents an hour.

She also does internet job searches every day looking at three or four job sites trying to get full time work. She has applied for some secretarial jobs, but has not gotten them. She last applied for a supervisor job at Sears, but again was not selected. The jobs that are available for someone with her education are all minimum wage jobs. At least with Giant Eagle, she is able to accrue seniority which gives her access to extra hours at the holiday seasons and, in the summer, gives her the flexibility to work at night so that she can watch the children during the day without having to pay for child care.

Alethea is now 35 years old. Her children are ages 11 and 12.

### Alethea's Loan History

Alethea took out several loans over the years to attend Notre Dame College, the Academy of Court Reporting, and the paralegal course at Stautzenberger College. Some of the loans were guaranteed by Great Lakes Higher Education Corporation under the Federal Family Education Loan Program. By agreement, Great Lakes transferred all of those defaulted loans to substituted defendant Educational Credit Management Corporation (ECMC).[7] The amount due to ECMC is $32,243.31, consisting of $32,169.58 principal and $73.73 interest.[8] Alethea took out five of the remaining loans from BankOne. After she defaulted, BankOne transferred the loans by agreement to the United States on behalf of its agency the United States Department of Education.[9] Alethea took out a sixth loan directly from the Department of Education. The amount due on these loans now totals $39,685.73, consisting of $37,002.72 principal and $2,682.01 interest.[10] The loans accrue in-

---

6. Defs. Joint Exh. B, Interrogatory no. 12.

7. Uncontested Facts ¶ 4.

8. Uncontested Facts ¶ 4; ECMC Answer ¶ 3.

9. Uncontested Facts ¶¶ 8–11.

10. Uncontested Facts ¶ 7, United States Answer ¶ 3.

terest at the rate of 6.8%.[11]

A small amount has been paid or credited to these loans. In 2011 and 2012, Alethea wanted to extend her deferment with Great Lakes, but it would not do that unless she first made a certain number of payments. Alethea's mother agreed to make the 10 payments totaling $1,410.00 because Alethea did not have any money to do so.[12] Additionally, in 2013 the United States offset her tax year 2012 tax refund and in 2014 it garnished her wages, applying a total of $4,815.69 to her account.[13]

### Income History

Alethea's income has come from her employment at Giant Eagle and Earned Income Credits. She has fallen within the Federal Poverty Guidelines every year since 2008.

| Debtor's Employment Income [14] | | Federal Poverty Guidelines [15] |
|---|---|---|
| 2008 | $4,073.35 | $17,600.00 |
| 2009 | $10,529.75 | $18,310.00 |
| 2010 | $12,874.66 | $18,310.00 |
| 2011 | $13,543.00 | $18,530.00 |
| 2012 | $16,746.00 | $19,090.00 |
| 2013 | $18,651.00 | $19,530.00 |
| 2014 | $13,893.53 (as of 8–28–14) | $19,790.00 |

In 2013, Alethea also received a tax refund of $5,759.00. She claimed these earned income tax credits on her federal income tax returns: $5,112.00 (2011), $5,236.00 (2012), and $5,131.00 (2013).[16]

### Alethea's Budget

Alethea takes home $1,328.00 a month for her family of three.[17] From that, she pays these expenses: food and housekeeping supplies ($525.00); clothing, laundry, and drycleaning ($180.00); medical and dental expenses for herself and for part of the children's expenses ($100.00); transportation ($270.00); entertainment, recreation, and the like ($40.00); charitable contributions ($40.00); car insurance ($50.00); cell phone ($50.00); hair care ($30.00); and personal care items ($40.00), for a total of $1,325.00. That leaves her with a monthly balance of $3.00.[18]

Alethea's budget does not include any rent or utilities because her mother and stepfather have agreed not to charge her. The budget does not include health insurance because Alethea has not been able to obtain it. The budget does not include any car payments because she owns and drives a 2003 Toyota with 163,000 miles. There are no amounts for childcare because she and her mother are the primary caretakers.

Alethea used her 2013 tax refund for the balance due on her child's braces, a child's pair of glasses, clothes and shoes for the children, school supplies, and to make some repairs to her 11 year old car. The defendants did not challenge the amount or reasonableness of any of her expenses.

11. Uncontested Facts ¶ 10.

12. Uncontested Facts ¶ 25; trial testimony.

13. Uncontested Facts ¶ 24; United States Exh. B, Interrogatory no. 6.

14. Uncontested Facts; Pl. Exh. 1–5; and Joint Exh. 3.

15. Uncontested Facts, ¶ 17; Joint Exh. B.

16. Joint Exh. 3.

17. Schedule I, line 7.

18. Schedule J, line 23c.

### What Alethea Thinks the Foreseeable Future will Bring

Alethea does not anticipate being able to go back to school to complete her degree at Notre Dame because it would take her too long and she does not have family support to take care of the children or the money for tuition. She is not interested in trying to borrow the money because it would just be more money that she cannot repay. Additionally, if she stayed with her psychology major, she would need to continue on to get a Ph.D. to be eligible for a good job in that field. Again, she does not have the money or the home support to do that.

With respect to the court reporting and paralegal programs, she did not get far enough to be able to pick either of those back up at this point. And once again, she lacks money and home support to go back to those programs and does not want to borrow more money.

Alethea does not anticipate being able to move out of her mother's home now or in the foreseeable future. Although she is looking for a full time job at a better wage, she has found that her qualifications only make her eligible for minimum wage jobs. She does not foresee being able to get a job that would put her in a better financial position than she is in now.

### The Repayment Offers

Both ECMC and the United States offered Alethea income based repayment plans.

### The ECMC Offer [19]

As of April 2014, Alethea owes ECMC $32,243.31. ECMC offered to put Alethea into an Income Based Repayment Program where, based on her 2013 income and family size, she would have an estimated initial monthly payment of zero. That amount would change from year to year, depending on those same two factors. The repayment term would be 25 years. These would be new loans that are not subject to discharge.[20] Under certain circumstances, the balance still owed at the end of 25 years would be forgiven, although the debt forgiveness might be a taxable event. The tax consequences, if any, would depend on the tax laws in effect in 2038.[21]

### The United States's Offer [22]

As of April 2014, Alethea owes the United States $39,685.73. The United States offered to put her into an income-sensitive repayment program where, based on income and family size, she would have an estimated initial monthly payment of zero. That amount would change from year to year, again depending on her income and family size. If she met her obligations under the program for 25 years, any balance due and owing on the loan would be considered an undue hardship and discharged.

### Alethea's Rejection of the Offers

Alethea declined both offers because she is unable to meet her current monthly expenses,[23] and does not see anything changing in the foreseeable future. The United States asked her in an interrogatory to explain why she had not availed herself of the programs offered. She responded:

> With two children and no support and a part-time job, there is no way to pay the student loans under any program.

\*       \*       \*

---

19. ECMC Exh. B.

20. ECMC Mem. Law, docket 39 at 7.

21. *Id.*

22. Uncontested Facts ¶ 7 and ¶ 29.

23. Trial testimony; United States Exh. E.

I have held the same job for 5 years. I have no degree as I was unable to finish school due to the birth of my children and divorce.

If I tried to find a place to rent, I would not be able to buy food and clothing. I am barely surviving and cannot meet even basic monthly expenses without a free roof over my head.[24]

Similarly, ECMC asked her in an interrogatory to:

State and describe in detail both the reasons why you are presently entitled to an undue hardship discharge based upon your current financial situation and any additional circumstances existing that indicate that your current situation will persist for a significant portion of the repayment period of your student loan obligation.

Alethea responded:

My gross wage is $10.15 per hour at 32 hours a week.

I have two children. I am living at poverty level.

My vehicle is in poor condition (11 years old).

I can't even afford rent or utilities.

This is just a preliminary list.[25]

## DISCUSSION

### 11 U.S.C. § 523(a)(8)

The norm is that a chapter 7 debtor is not discharged from student loan debt. The only exception is if the debtor proves that having to repay this debt would "impose an undue hardship on the debtor and the debtor's dependents[.]" 11 U.S.C. § 523(a)(8). This provision balances two competing policy objectives: (1) the honest but unfortunate debtor's right to a fresh start; and (2) the need to protect the financial integrity of student loan pro-

grams so that lenders will loan money to individuals who would not meet the traditional underwriting standards for such loans. *Gorosh v. Posner (In re Posner)*, 434 B.R. 800, 803 (Bankr.E.D.Mich.2010).

A determination of undue hardship "requires a three-part analysis: '(1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents, if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.'" *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir.2005) (quoting *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)). The debtor bears the burden of proving each part of the analysis by a preponderance of the evidence. *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 358–59 (6th Cir.2007).

### Minimal Standard of Living

Under the first part of the analysis, the debtor must show that she will be unable to maintain a minimal standard of living for herself and her children if she is required to repay the student loans. The point of this requirement "is that a debtor, after providing for … her basic needs, may not allocate any of … her financial resources to the detriment of [her] student loan creditors." *Mitcham v. United States Dept. of Educ. (In re Mitcham)*, 293 B.R. 138, 144 (Bankr.N.D.Ohio 2003). The focus here is on the debtor's income and the expenses that are necessary to meet her basic needs. *Id.* The court is not required

---

**24.** Alethea's Response to United States Interrogatories, Defs. Joint Exh. B at ¶ 14 and ¶ 18.

**25.** Alethea's Response to ECMC Interrogatories, Defs. Joint Exh. C at ¶ 24.

to accept the debtor's stated income and expenses at face value. *Malone v. Higher Educ. Student Assistance (In re Malone),* 469 B.R. 768, 773 (Bankr.N.D.Ohio 2012). ECMC argues that Alethea has been able to maintain a minimal standard of living, and that her income has been "steadily increasing." [26] The United States noted this prong in its brief, but did not argue that Alethea is able to maintain a minimal standard of living.

█ This first prong asks two questions: (a) is the debtor able to maintain a minimal standard of living now; and (b) would she be able to do so if she had to repay the student loans? The debtor proved that she is not able to maintain a minimal standard of living now, regardless of the student loans. At the age of 35, she has no money to pay rent or utilities for housing for herself and her two children. Without the generosity of her mother and stepfather, her family would have nowhere to live. Her salary does not allow her to provide for her family's basic needs, which would certainly include shelter and utilities. She does not have health insurance for herself, which is also a basic need in this day and age. Similarly, reliable transportation to get to work is a basic need. Alethea's car is 11 years old and has more than 160,000 miles; the older it gets, the more likely it is that it will need significant repairs or need to be replaced. She does not have the money to do either one of those. Her income is, as ECMC points out, "steadily rising" from an objective point of view. But, starting at $10.15 an hour, it is rising at the rate of about 75 cents an hour every year. Those raises will not take her out of poverty any time in the foreseeable future.

In sum, Alethea is in desperate financial straits even without paying anything toward the student loans; if she had to pay anything toward those loans, it could only come at the expense of such basics as food and clothing for herself and her children.

*Additional Circumstances*

█ Under the second prong, the debtor must prove that her financial difficulties are not temporary and are likely to persist for a significant portion of the repayment period. "Such circumstances must be indicative of a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'" *Oyler,* 397 F.3d at 386 (quoting *In re Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993)). These circumstances may include, but are not limited to, illness, disability, the lack of useable job skills, or a large number of dependents. *Barrett,* 487 F.3d at 359. Additionally, the circumstances must result from events which are beyond the debtor's control. *Oyler,* 397 F.3d at 386. Therefore, while a debtor's work history is relevant in projecting whether the debtor's current state of affairs is likely to continue, a debtor's decision to chose a low-paying job rather than to maximize earnings does not merit relief. *See Barrett,* 487 F.3d at 360.

█ ECMC contends that (1) Alethea's poverty wages are of her own making because she did not carry any of her three educational programs through to completion; (2) when her children reach the age of majority, Alethea will have money to repay the loans; and (3) she is in good health. The United States joins in the latter two arguments.

█ The evidence showed conclusively that Alethea's financial situation is not temporary and that it is likely to persist for a significant part of the repayment period. It also shows that her financial difficulties are not of her own making. On the last point, Alethea dropped out of No-

---

**26.** ECMC Mem. Law, docket 39 at 4.

tre Dame at the insistence of her then-husband, who turned out to be abusive in multiple ways. She tried to go to court reporting school because she thought it would take too long to go back to Notre Dame. Again, that did not work out because of Carmen. The same thing happened when she started with the paralegal program. This is not a situation where Alethea was dithering about trying to decide what she wanted to study, jumping from program to program, instead of putting her shoulder to the wheel and getting a degree that would lead to a good job. What happened is that Alethea was forced to drop out of Notre Dame, the Academy of Court Reporting, and the Stautzenberger paralegal program because of Carmen. She did what she could to get out of that domestic situation, eventually finding a way to separate permanently from Carmen. She did not choose her low-paying job over a better alternative—she had no alternative.

The circumstances in which Alethea finds herself are likely to persist for the loan repayment period. Why? Because she does not have the time, money or family support to return to school to get additional education that might lead to a better job. The only jobs for which she is qualified are minimum wage jobs. ECMC and the United States argue that Alethea's situation will change for the better in about 7 to 8 years when her children reach the age of emancipation. Their confidence that Alethea's financial responsibility to the children will end at that point thus making funds available to pay the loans is speculation. If Alethea does have some resulting additional disposable income, she would be entitled to obtain independent housing and other basic items of subsistence before she would have any funds to apply to the loans.

In sum, the overall state of affairs where Alethea is likely to remain in a poverty level job with insufficient income to pay her basic expenses is not temporary, but is instead likely to persist over the repayment period.

### Good Faith Efforts to Repay

The third part of the analysis examines whether the debtor made a good faith effort to repay her student loans. "Good faith, in this context, is essentially an inquiry into whether the debtor has consciously or irresponsibly disregarded his or her repayment obligation—or, instead, whether there is some justification for the debtor's default and on-going inability to repay the loan." *Crawley v. Educ. Credit Mgmt. Corp. (In re Crawley)*, 460 B.R. 421, 444 (Bankr.E.D.Pa.2011). As one court noted, the issue "is not so much whether a debtor has made a good faith effort to repay as it is a question of overall good faith in regard to the student loan." *Afflitto v. United States (In re Afflitto)*, 273 B.R. 162, 171 (Bankr. W.D.Tenn.2001).

The Sixth Circuit has cited to a number of factors that may be considered on this issue: (1) was the debtor's failure to pay due to factors beyond her reasonable control; (2) did the debtor use all available resources to pay the debt; (3) is the debtor making her best effort to maximize her earning potential; (4) how soon after the loan first became due did the debtor seek to discharge the debt; (5) what is the percentage of the student loan debt in relationship to the debtor's total debt; and (6) has the debtor obtained a tangible benefit from the student loan debt. *Fields v. Sallie Mae Servs. Corp. (In re Fields)*, 286 Fed.Appx. 246, 249 (6th Cir.2007) (unpublished opinion). Additionally, the Sixth Circuit Bankruptcy Appellate Panel has listed these factors: "the debtor's repayment history and … efforts to obtain employment, maximize income, minimize expenses, and participate in al-

ternative repayment programs[.]" *Trudel v. United States Dept. of Educ. (In re Trudel)*, 514 B.R. 219, 229 (6th Cir. BAP 2014).

ECMC and the United States argue that Alethea did not prove her good faith because she did not make any voluntary payments and has declined to enter into repayment programs with a current monthly payment of zero. Looking back to the loan originations, the creditors do not argue that Alethea showed lack of good faith when she borrowed the money over several years. In fact, they (or their predecessors in interest) loaned her money to attend the Academy of Court Reporting knowing that she had not completed her course at Notre Dame, and then again loaned her money to attend the Stautzenberger paralegal program knowing that she had not completed her course at the Academy. Alethea did not get any tangible benefit from any of these programs because she would more likely than not have been qualified for her job at Giant Eagle without any of that education. She has taken many steps over the years to try to maximize her income, to no avail. She cannot minimize her expenses beyond what she has already done. There was no evidence that she has ever used her income for luxury goods or frivolous items. She has no assets that she could sell to apply the proceeds toward the loans. All of this points to good faith.

ECMC and the United States correctly note that Alethea did not herself make any voluntary payments, although her mother did. They do not dispute that the reason Alethea failed to make regular payments is because, with her limited income and tight budget, she never had the money to do so. The United States does, however, contend that Alethea showed lack of good faith when she did not apply her 2013 tax refund to its loans. If Alethea had used those funds for something frivolous or even arguably unnecessary, the United States would have a point. Alethea, though, used the money to pay for her children's medical needs, school needs, and to repair the 11 year old car. Under those circumstances, the failure to make voluntary payments is not evidence of lack of good faith.

ECMC and the United States really pin their lack of good faith argument on the fact that Alethea declined their offers to enter into income contingent repayment programs. A debtor's decision not to participate in a repayment program is relevant as to intent to repay the loans, but is not *a per se* indication of lack of good faith. *Barrett*, 487 F.3d at 365. A debtor must, however, provide a "probative explanation for their behavior." *Trudel*, 514 B.R. at 229. In *Barrett*, for example, the Sixth Circuit concluded that a debtor's decision not to participate in a repayment program was reasonable in light of the significant tax consequences of enrolling due to his present and future inability to repay the debt. 487 F.3d at 365–66.

Essentially, the defendants' argument is that Alethea showed lack of good faith by not signing the agreement because if she really believed her income would not increase significantly she would have signed, knowing that she would not have to repay the money or suffer adverse tax consequences. In other words, the only way for Alethea to show good faith would be if she agrees to forego her undue hardship lawsuit. That would mean that any debtor who decided not to participate would be subject to a *per se* finding of lack of good faith, contrary to *Barrett*. See 487 F.3d at 364 ("Although ECMC doesn't state so explicitly, its position would create at *per se* rule requiring enrollment in the ICRP to satisfy the third *Brunner* prong and thus would, in effect, eliminate the dis-

charge of student loans for undue hardship from the Bankruptcy Code.")

The court finds Alethea's reasons for declining to enter into the agreements to be credible, convincing, and offered in good faith: she cannot pay anything now and she cannot pay anything in the foreseeable future, meaning that her participation in the programs would be futile. If she continues to receive raises at her current rate of 25 cents every four months, she will have a 75 cent an hour raise in the next year and another 75 cents in the year after that. There was no evidence that the debtor will ever be able to repay the loans on that income; it is simply conjecture to say that at some point in the future there is a likelihood that Alethea will be able to stretch her low wage income to both provide for her family and to make payments.

Additionally, there are burdens associated with entering into these agreements. First, ECMC requires a debtor to enter into new, nondischargeable loans. Alethea would as a result be "trading one nondischargeable debt for another." *Barrett,* 487 F.3d at 364. Second, Alethea would have to supply financial information each year for the next 25 years so that the minimum payment could be recalculated. A debtor who is entitled to and receives a hardship discharge does not have that additional burden. And third, as in *Barrett,* "ECMC's argument overlooks the psychological effect of having a significant debt remain[.]" *Id.* at 365 n. 8. Given Alethea's desperate circumstances, and her status as the proverbial honest but unfortunate debtor,[27] she is entitled to sleep at night without these unpayable debts continuing to hang over her head for the next 25 years.

**27.** *See Pazdzierz v. First Am. Title Ins. Co. (In re Pazdzierz),* 718 F.3d 582, 586 (6th Cir.2013) (noting that giving honest but unfortunate

## CONCLUSION

The debtor Alethea Lamento proved that she is entitled to a hardship discharge of the students loans at issue. The loans are, therefore, discharged.

A separate judgment reflecting this decision will be entered.

debtors a fresh start is a central purpose of the Bankruptcy Code).